AO 106 (Rev. 04/10) Application for a Search Warrant

JESSICA
AUTHORIZED AND APPROVED/DATE: PERRY

Digitally signed by JESSICA PERRY
Date: 2024.04.23 09:54:27 -05'00'

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

In the Matter of the Search of

SUBJECT PREMISES 1 KNOWN AS 1500 60TH STREET, NOBLE, OKLAHOMA 73068 AND ALL OUTBUILDINGS, VEHICLES, AND CURTILAGE

)
)
)
)
)
)

Case No. M-24-371-STE

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment "A"

located in the ___WESTERN___ District of ___OKLAHOMA___ , there is now concealed *(identify the or describe the property to be seized):*

See Attachment "B"   which is incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 7 U.S.C. § 2024 | Food Stamp Fraud |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |
| 18 U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

See attached Affidavit of USDA-OIG Special Agent Erika Skaggs, which is incorporated by reference herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA Erika Skaggs, USDA-OIG

*Printed name and title*

Sworn to before me and signed in my presence.

Date: **Apr 23, 2024**

City and state: Oklahoma City, Oklahoma

_____
*Judge's signature*

SHON T. ERWIN, U.S. MAGISTRATE JUDGE

*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: SUBJECT PREMISES 1 KNOWN AS 1500 60TH STREET, NOBLE, OKLAHOMA 73068 AND ALL OUTBUILDINGS, VEHICLES, AND CURTILAGE | Case No. MJ-24-371-STE |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41**
**FOR A WARRANT TO SEARCH AND SEIZE**

I, Erika Skaggs, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.    This affidavit is presented in support of an application to search the premises known as 1500 60th Street, Noble, Oklahoma 73068, and all outbuildings, vehicles, and curtilage, hereinafter "**SUBJECT PREMISES 1**," further described in Attachment A (Location to be searched), and to seize the items described in Attachment B (Items to be Seized).

2.    I am a Special Agent with the United States Department of Agriculture – Office of Inspector General (USDA-OIG). I have been so employed since June 2023. I am currently assigned to the Oklahoma Resident Office in the Southwest Region. Prior to holding this position, I was a Special Agent of the Internal Revenue Service—Criminal Investigation (IRS-CI). I was so employed from January 2002 through June 2023. As a Special Agent, some of my functions include investigating individuals engaged in activities constituting criminal violations against the USDA and other related offenses. My duties include conducting criminal investigations into fraud, waste, and abuse within the programs and operations of the USDA. I earned a Bachelor of Science degree in Finance at Oral Roberts University, while working for Bank of America and Arvest State Bank in Tulsa, Oklahoma. I also graduated from the Special Agent Basic Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.

1

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

4.      Based on my training an experience, and the facts set forth in this affidavit, I submit there is probable cause to believe that violations of Title 7, United States Code, Section 2024 (food stamp fraud), and Title 18, United States Code, Section 1028A (aggravated identity theft), and Title 18, United States Code, Section 1343 (wire fraud) have been committed, and that evidence, fruits, and instrumentalities of these crimes, as described in Attachment B, will be found within the **SUBJECT PREMISES 1** as described in Attachment A.

### FACTS ESTABLISHING PROBABLE CAUSE

5.   During January 2024, I was contacted by the Oklahoma Department of Human Service (OKDHS) regarding a possible identity theft/Supplemental Nutrition Assistance Program (SNAP) Electronic Benefits Transfer (EBT) fraud committed by Steven Melton Jr. and Steven Melton Sr. pertaining to the years 2023-2024.

6.   In April 2023, an on-line application to become a Farmer's Market retailer that accepts SNAP EBT benefits was completed with the United States Department of Agriculture (USDA) Food and Nutrition Services (FNS). The following information was provided:

- Store Name: M&M Farms
- Store Open Date: June 15, 2023
- Store Location:1500 60th St, Noble, OK 73068 (**SUBJECT PREMISES 1**)
- Mailing Address: 1500 60th St, Noble, OK 73068 (**SUBJECT PREMISES 1**)
- Owner Email Address: joshualyonwright1993@gmail.com

This application was withdrawn on May 16, 2023.

7.      In June 2023, an on-line application to become a Farmer's Market retailer that accepts SNAP EBT benefits was completed with USDA-FNS. The following information was provided:

- Store Name: Wrights Farms

- Store Open Date: June 15, 2023
- Store Location: 1500 60th St, Noble, OK 73068 (**SUBJECT PREMISES 1**)
- Mailing Address: 833 Highgarden Cir, Noble, OK 73068 (**SUBJECT PREMISES 2**)
- Store Owner: Joshua Lyon Wright
- Owner Email Address: joshualwright119@gmail.com

A Michigan Driver's License (DL) was provided with the application.  The DL shows the name "Joshua Lyon Wright." A Social Security Card was also provided with the SSN of XXX-XX-5216.

8.      On June 6, 2023, USDA-FNS approved the application for Wrights Farms to accept SNAP EBT.

9.      In December 2023, investigators reviewed the EBT transaction report for Wrights Farms.  The report showed that Wrights Farms began accepting SNAP EBT in June 2023.  From June 2023 through March 2024, Wrights Farms accepted over $170,000 in SNAP EBT benefits.  The transactions were all large transactions over $50 each. The overwhelming majority of the transactions were over $200 each. Almost all individual recipient transactions were for the total benefits available on the EBT card.

10.     Total benefits available to a recipient is based on a calculation of income and other eligibility factors for a recipient's household.  Some households receive the maximum SNAP allotment for the household's size.  Others receive a prorated amount, which is dependent on eligibility factors.  Once established, the total SNAP benefits are made available monthly, on the 1st, 5th, or 10th of every month, depending on the recipient's case number.

11.     Based on my knowledge, training, and experience, as well as conversations with other USDA-OIG investigators, I know that large single transactions, for the total available EBT funds each month, is an indicator the retailer is using their point-of-sale devise to illegally exchange SNAP for items other than eligible food.  SNAP recipients typically do not buy groceries each month for the exact total of the allowable funds.  Usually, the transaction amounts are smaller and occur over the course of the month.

12.    Investigators researched the individual transactions at Wrights Farms and found approximately 50 different SNAP accounts were used. Except for approximately four SNAP cases, all the SNAP benefits for those 50 accounts were used only at Wrights Farms. The SNAP accounts did not have any transactions at other retailers.

13.    When a person applies for SNAP benefits through OKDHS, they must provide an identification (ID) before being given SNAP benefits. Investigators reviewed the ID cards that were provided for the approximate 50 SNAP cases whose EBT cards were used at Wrights Farms.  More than 80 of the ID cards presented to OKDHS were out-of-state ID cards/DLs. Many of those IDs were fake/altered.

14.    Investigators reviewed OKDHS records and found Steven Melton (DOB 2/6/1958), Steven Melton, Jr. (DOB 2/24/1985), and David Locke (DOB 8/24/1969) all have SNAP benefit cases through OKDHS and have listed **SUBJECT PREMISES 1** as their residence.

15.    OKDHS records show that an application was submitted for David Locke to receive SNAP benefits in June 2020.  In support of the application, the applicant provided a California DL, Social Security Number XXX-XX-9478, and listed an address of 13249 NS3650 RD, Wewoka, OK.  In February 2022, Locke's address was updated to **SUBJECT PREMISES 1**.  Investigators accessed public records databases to establish the address history for Locke.  Public records show that Locke has residence outside of the State of Oklahoma.  Based on my knowledge, training, and experience, I know this is indicative of identity theft.

16.    As mentioned previously in this affidavit, investigators discovered four SNAP accounts that had transactions at Wrights Farms in addition to transactions at another retailer.  David Locke's EBT card was one of those accounts. Locke's EBT card was used at Walmart online 3 times in April and May 2023. Walmart provided the transaction information, which shows "Steve Melton" conducted the transactions. The transaction information also lists an email address of "okgambler85@gmail.com" and a shipping address at **SUBJECT PREMISES 1**.

4

17.     The Cleveland County Assessor's website lists **SUBJECT PREMISES 1** as belonging to Steve Melton.

18.     The Cleveland County Assessor's website lists **SUBJECT PREMISES 2** as belonging to Bryce A. Riddle (Riddle).   Riddle purchased the home on April 28, 2023, prior to the creation of Wrights Farms.  Investigators have conducted surveillance as well as exhausted their review of social media and other databases without determining a connection between Riddle and Steven Melton Sr. or Steven Melton Jr.

19.     However, investigators communicated with A.C., Project Manager for MarketLink, a program of the National Association of Farmers Market Nutrition Program.  A.C. stated that MarketLink has a contract with Wrights Farms (FNS #0864035).  MarketLink processes the transactions associated with SNAP cards received by Wrights Farms.  They have processed these transactions for Wrights Farms since June 2023.  MarketLink mailed point-of-sale devices to Wrights Farms at **SUBJECT PREMISES 2** in June 2023.  A.C. can tell by the transaction details that the transactions processed by Wright Farms used the point-of-sale device mailed to **SUBJECT PREMISES 2**.

20.     A.C. has further determined that the majority of EBT charges run through the point-of-sale device each month are "card present," with only one manual entry.  "Card present" means the card, belonging to each of the separate cardholders, was present and swiped though the point-of-sale device each time a transaction was processed.

21.     Investigators reviewed Steven Melton Jr.'s criminal history and learned he has been convicted of fraud charges in the past. His listed occupation on the criminal history is "Poker Player." Steven Melton Jr. was born in 1985. The email address provided for the Walmart online order correlates to Steven Melton Jr.'s occupation and birth year.

22.     Investigators reviewed the email addresses that were provided to OKDHS on the SNAP applications for the approximately 50 SNAP accounts that

were used at Wrights Farms. The email addresses were consistently the name of the person and the year of birth, followed by "@gmail.com," which similarly matches Steven Melton Jr.'s email address.  For example, the application for "Robert Wolf," who was born in 1994, listed an email address of robertwolf94@gmail.com.

23.    Investigators reviewed the DL for Steven Melton Jr. that was provided to OKDHS in June 2020 to receive SNAP benefits.  The license listed Melton's address as 13249 NS 3650 Wewoka, OK.  This is the same address that was provided for David Locke in June 2020.

24.    Investigators reviewed OKDHS records for "Joshua Lyon Wright," the name that was listed as the store owner for Wrights Farms. OKDHS records show a SNAP benefit application was submitted for Wright in March 2023.  A Michigan DL was provided to OKDHS with the application. The photo on the Michigan DL appears to be a photo of Steven Melton Jr.  Investigators reviewed information for Joshua Lyon Wright in law enforcement databases and found the true DL photo for Wright. The photo in the database does not match the photo provided to OKDHS.  The same DL was provided to USDA on the application for Wrights Farms to become a retailer of SNAP benefits. Joshua Wright's SNAP application also included the email address JokesterW83@gmail.com, which follows the similar pattern as other email addresses used by Steven Melton Jr. by including the last two digits of the year of birth.  The application also included an address of 836 Highgarden Cir, Noble, OK, which is very close to the mailing address of **SUBJECT PREMISES 2** from the Wrights Farms SNAP retailer application.

25.    Investigators have identified a real individual named Joshua Lyon Wright with an SSN ending in 5216.  The real Joshua Lyon Wright owns and operates not less than 10 mortgage and real estate companies in the state of Michigan.  Investigators reviewed more than 9,000 pages of bank statements showing no relationship to the state of Oklahoma or any company called Wrights

Farms.  Law enforcement databases do not show any legitimate address for Joshua Lyon Wright in Oklahoma.

26.    Steven Melton Jr. and Steven Melton Sr. each have their own SNAP accounts through OKDHS.  Investigators reviewed the SNAP usage for Steven Melton Jr.'s SNAP EBT card and observed transactions at Walmart located at 3651 Classen Boulevard in Norman, OK on December 29, 2023, and January 2, 2024.  Investigators also reviewed Walmart transaction details.  Video footage for December 29, 2023, shows Steven Melton Sr. using Steven Melton Jr.'s SNAP EBT card.  Video footage and receipt information for the January 2, 2024, transaction shows Kelly Redus using her personal Debit Card along with Steven Melton Jr.'s SNAP EBT card to make the purchase. Driver's license records show that when Redus renewed her DL in June 2023, she reported her address as **SUBJECT PREMISES 1**.

27.    OKDHS records show that on January 3, 2024, Steven Melton Sr. applied to renew his SNAP benefits with OKDHS and reported his address as **SUBJECT PREMISES 1**.

28.    On January 18, 2024, Investigators conducted surveillance on 37 properties listed as addresses for the recipients who's EBT benefits were used exclusively at Wrights Farms.  Seven addresses listed were unoccupied and newly constructed. More than ten listed addresses were on the same street, and many of the residences were listed for sale on the date of surveillance.  Three addresses listed for recipients were not actual addresses, but empty wooded lots.  One of the listed addresses was Noble High School.  Based on my knowledge, training, and experience, this is indicative of identity theft.

29.    According to public record databases, about 80 SNAP recipients associated with the approximately 50 SNAP accounts used at Wrights Farms have established addresses outside of the State of Oklahoma.  None of the 80 recipients have a history of addresses or family in the State of Oklahoma.  Based on my knowledge, training, and experience, this is indicative of identity theft.

30.     Investigators reviewed addresses associated with the approximately 50 fraudulent SNAP cases being used at Wrights Farms and discovered many of the cases used the address of 3334 W. Main Street #187 in Norman, Oklahoma.   On January 3, 2024, at approximately 10:00 a.m., investigators went to 3334 W. Main Street in Norman, Oklahoma and discovered the address was a UPS Store with mailboxes inside the lobby. Investigators interviewed UPS employee A.W. regarding the renter of Box 187.  A.W. advised Box 187 is rented by "Peter Coulter." Further, A.W. reported that Coulter opened the account on July 21, 2023. A.W. advised she could not find the actual ID that was provided with the account. A.W. advised she would not be able to identify Coulter.   "Peter Coulter" is one of the identities associated with SNAP benefits used at Wrights Farms.

31.     Investigators showed A.W. a photo of Steven Melton, Jr. and asked her if she recognized him. A.W. reported that she has seen him several times come into the store.  Melton usually has a key in his hand and retrieves his mail from one of the mailboxes.  She did not know what box he checked.

32.     Investigators showed UPS employee R.M. the same photo of Steven Melton Jr.  R.M. advised that she recognized Melton and has observed Melton come into the store to retrieve his mail from one of the mailboxes.  R.M. did not know what box he checked.

### Background on the SNAP Program

33.     The United States Department of Agriculture (USDA) Food and Nutrition Service (FNS) is a federal agency responsible for administering the Supplemental Nutrition Assistance Program (SNAP), formerly known as the Food Stamp Program. SNAP is a federally-funded program that was established to provide a more nutritious diet to low-income families and individuals by allowing SNAP recipients to buy eligible food items at approved retail stores.

34.     USDA administers the SNAP through its FNS division.   FNS administers the authorization and disqualification procedures for the retail food establishments participating in the redemption of SNAP benefits.

35.     In order to participate in SNAP, a retail business must submit a FNS Form 252, "SNAP Application for Stores."  The owner/manager of that business is provided with a training "kit," which includes a training DVD and packet.  The FNS Form 252 sets forth in detail the rules for participation and includes an acknowledgement and understanding form which the store owner/manager is required to sign, signifying their agreement to participate in the SNAP program lawfully.

36.     Regulations promulgated by the Secretary of Agriculture mandate that retailers authorized to participate in SNAP may only accept SNAP benefits in exchange for the purchase of eligible food items.  Ineligible items include alcoholic beverages, tobacco products, pet food, household supplies, vitamins, prepared foods, and hot foods.  SNAP benefits may not under any circumstances be purchased or sold in exchange for cash.  This practice is commonly known as "trafficking."

37.     SNAP benefits are distributed on an EBT card that is similar to a prepaid debit card.  In Oklahoma, the EBT cards are known as "Access Oklahoma" cards. A SNAP recipient's benefits are electronically posted to their Access Oklahoma card on a monthly basis.

38.     OKDHS determines who is eligible for SNAP benefits and administers the distribution and redemption of those benefits in Oklahoma. Individuals or families that need SNAP benefits may apply for assistance through the OKDHS.  Applicant eligibility is determined by citizenship, income, and the number of people living within a household.

39.     Individuals applying for SNAP benefits in Oklahoma may utilize the Oklahoma Department of Human Services Live (OKDHS Live) online system to apply for SNAP benefits.  This allows the recipient to apply for benefits via the Internet without conducting a face-to-face interview.

40.     Like any other debit card, an Access Oklahoma card has a magnetic strip on the back.  After calculating the SNAP subtotal, the cashier or participant

swipes the card through a card reader or point-of-sale (POS) terminal to begin the transaction. The participant then enters his or her secret personal identification number (PIN) number into the keypad and the sale is authorized if sufficient funds are available. Funds are then electronically transferred from the participant's SNAP account to the processing store's account. The system conducts a reconciliation of accounts daily and involves interstate wire communications.

41.    Investigators have the ability to monitor the EBT transactions at a particular store by accessing various databases. This monitoring allows the investigators to view the transaction by card number at the store as it is being processed for redemption. It also allows the investigators to see the dollar amount of the transaction.

42.    Based on my knowledge, training, and experience, and the training and experience of the agents assisting in this investigation, as well as investigative efforts that have been discussed above, the items listed in Attachment B are often kept at stores involved in the legitimate redemption of SNAP benefits as well as locations trafficking in SNAP benefits. During the routine course of running a retail business, most of these items are kept on hand as a matter of convenience, and for legitimate record keeping and accounting purposes, and would be found in any business engaged in retail sales. Moreover, the records are often kept for years.

43.    Based on my knowledge, training, and experience, as well as the training and experience of agents assisting in this investigation, stores involved in criminal activity frequently keep multiple sets of business records to segregate legitimate from illegitimate activity. They also keep large caches of currency on hand to support the illegal enterprise being run out of the store. Businesses engaged in SNAP trafficking also often grossly under-report their earnings to state and federal tax agencies in an effort to hide the illegitimate proceeds.

44.    Based on my knowledge, training, and experience, as well as the training and experience of the agents assisting in this investigation, illegitimate

proceeds from cash-driven crimes are often laundered back through businesses in the form of money order or wire transfer purchases. Monies are also deposited into mutual funds, e-trade accounts, and other accounts to avoid currency reporting requirements. All these procedures create written and/or electronic records that would likely be kept on hand inside the business.

45. Based on my knowledge, training, and experience, I know that individuals engaging in different types of fraud, including identity theft and USDA program fraud, generate and often maintain paper and electronic records pertaining to their illegal activities. These records may include but not be limited to lists of victim identities, financial transactions, PIN numbers, and asset purchases. Identity thieves and individuals engaging in USDA program fraud also often utilize computers, cellular telephones, and e-mail accounts to maintain records, communicate with conspirators, access bank records, file applications for USDA benefits and further their crimes. Paper and electronic records pertaining to the fraud are often maintained for extended periods of time. Particularly, electronic records remain on computers indefinitely unless they are deleted from the computer. Electronic records that are deleted are often still present on the computer and can be retrieved by experienced computer specialists. Specialized software is usually required to permanently delete electronic records from computers and other devices. The result is that evidence of the fraud exists for an extended period.

## Computer Related Evidence

46. Computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct respects: (1) the items themselves may be instrumentalities, fruits, and/or evidence of crime; and/or (2) items may have been used to collect and store information about crimes (in the form of electronic data). Thus, Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and seize computer hardware, software, documentation, passwords, and data security

devices which are (1) instrumentalities, fruits and/or evidence of crime; and/or (2) storage devices for information about crimes.

47.     Based on my knowledge, training, and experience, I know that searching information from computer-generated media, such as USB drives, often requires search by a qualified computer expert in laboratory or other controlled environment.  This is true because of computer storage devices can store the equivalent of thousands of pages of information.  Additionally, a suspect may try to conceal evidence; he or she might also store it in random order with deceptive file names.  This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and often it would be impractical to attempt this kind of search on-site.

48.     Searching computers for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  For example, on-site and laboratory analysis by a qualified computer specialist is often required in order to properly retrieve and analyze electronically stored data, to document and authenticate the data, and to prevent the loss of data.

49.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been created, deleted, and/or downloaded onto a computer. Electronic files downloaded to a computer can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the computer that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a

computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

50.     Wholly apart from user-generated files, a computer's internal hard drive contains electronic evidence of how a computer has been used, what it has been used for, and who has used it.   To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

51.     Forensic evidence.  As more particularly described in Attachment B, this application also seeks permission to locate not only computer files that might serve as direct evidence of the crimes described, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any of the computers at the subject locations because:

    a.     Data on the computer can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.  Computer file systems can record

information about the dates files were created and the sequence in which they were created.

b.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage

medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

52.  <u>Necessity of seizing or copying entire computers</u>.  In most cases, a thorough search of premises for information that might be stored on computers often requires the seizure of the computers and later off-site review consistent with the warrant.  In lieu of removing computers from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.  The time required for an examination:  as noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements: computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on

15

the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

    c.    Variety of forms of electronic media:  records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

53.    <u>Nature of examination</u>:  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing computers and other electronic media and permitting its later examination by the USDA-OIG's Investigations Forensics and Technologies Division located in Kansas City, Missouri consistent with the warrant.  The examination may require techniques, including but not limited to, computer-assisted scans of the entire computer, which might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## **<u>Conclusion</u>**

54.    For all of the foregoing reasons, I believe that there is probable cause to believe there is now concealed in **SUBJECT PREMISES 1**, particularly described in <u>Attachment A</u>, a copy of which attached to this affidavit and expressly incorporated herein by this reference, certain items, that is, the items listed in <u>Attachment B</u>, a copy of which is attached to this affidavit and expressly incorporated herein by this reference, said items being evidence of a crime; contraband, fruits of crime, or other items illegally possessed; or property designed for use, intended for use, or used in committing a crime, in violation of Title 7, United States Code, Section 2024 (food stamp fraud), and Title 18, United States Code, Sections 1028A (aggravated identity theft) and 1343 (wire fraud).  I further believe that the computers located at the premises will contain evidence of

these violations and request permission under Rule 41(e)(2)(B) to search these computers at an off-site location by law enforcement personnel properly trained in electronic evidence collection, preservation, and investigation.

Respectfully submitted,

ERIKA SKAGGS
Special Agent
United States Department of Agriculture
Office of Inspector General

Subscribed and sworn to before me
on April 23, 2024

JUDGE SHON T. ERWIN
UNITED STATES MAGISTRATE JUDGE

17

**Attachment A**
Location to Be Searched

Affiant states that said evidentiary items listed above may or will be found in the following premises or within the curtilage thereof and the appurtenances thereunto belonging, including outbuildings and vehicles, all within the County of Cleveland, State of Oklahoma, withing the Western District of Oklahoma more particularly described as:

> 1500 60th Street in the City of Noble, County of Cleveland, State of Oklahoma.  This property is a house that sits on approximately 40 acres of land. It is located on the West side of 60th Street and faces East.  It is a brick home with a brown composite-shingled roof and brownish colored brick. The Cleveland County Assessor's Office lists the legal description as *24-8-2W 40 AC SE/4 NE/4*. The house has a door that faces the east. A long driveway connects 60th Street to the house.  There is a black metal gate with brown brick walls containing brown brick columns on each side of the driveway. There is a black metal mailbox on the north side of the driveway just outside the brick wall with the numbers "1500." There are multiple out-buildings just south of the main house as well as many vehicles on the property.



**ATTACHMENT B**
Items to be Seized

1.      All records relating to violations of Title 7, United States Code, Section 2024 (food stamp fraud), and Title 18, United States Code, Sections 1028A (aggravated identity theft) and 1343 (wire fraud), those violations involving M&M Farms, Wrights Farms, Joshua Lyon Wright, Steven Melton Sr., Steven Melton Jr., and other unknown co-conspirators, and occurring after April 2023, including:

    a.  United States Department of Agriculture (USDA) Food Entitlement Program documentation, including Supplemental Nutrition Assistance Program (SNAP) food instruments/EBT Cards, redemption certificates, receipts, orders, written records, work papers, conversion charts, point-of-sale devices, and any other records used in the conversion and recording of food entitlement benefits purchasing or redemption.

    b.  Publications, booklets, posters, or flyers related to the USDA food entitlement programs, rules, and regulations.

    c.  Any letters, applications, documentation, or other correspondence relating to EBT SNAP transactions, including bank records, to include but not limited to, personal and business checking and savings account records, cancelled checks, check books, check registers, monthly statements, deposit and withdrawal slips, certificates of deposit, safe deposit box records or keys, copies or records of money orders purchased, sold or received, and records of wire transfers sent or received.

    d.  Cash register tapes, adding machine tapes, or any printed material from such machines.

    e.  Items used to create or modify any identification cards of others, drivers' licenses, social security cards, bank statements, checks, deposit

slips, credit cards, water bills, electric bills, passports, banking account records, signature cards, telephones, employment documents, Forms W-2, paystubs, birth certificates, travel documents, mortgage documents, deeds, rental contracts, loan agreements, Federal or State tax returns, Unemployment documents, government benefit information, shopping receipts, medical bills, letters, proof of delivery documents, credit reports, account log-in information.

f.  Lists of identification information of others

g.  Records of purchase, ownership and/or transfer of real property, vehicles or other valuable items, business ownership, employees, partnerships, including but not limited to deeds, closing statements, mortgage records, bills of sale, titles, registrations, insurance repair records, employee lists, and contact information.

h.  Records of the purchase, ownership, transfer or sale of stocks, bonds, or securities.  Any records of participation in mutual funds, retirement accounts or similar investments, funds, including statements, certificates and buy or sell orders.

i.  Original and/or copies of monthly, quarterly, or annual state or local tax reports.

j.  Original and/or copies of federal and state business and personal income tax returns.

k.  Address and/or telephone books reflecting names and contact information for personal associates, employees, and business partners, to include written records, cell phone directories, computerized address books and records and any correspondence between conspirators, electronic and otherwise.

l.  United States or foreign currency, cashier's checks, records of wire transfers, money orders, and/or any financial instrument, including but not limited to negotiable commercial papers, titles and similar securities,

checks, money orders, and other financial instruments which are connected with or possessed to facilitate the financing or concealment of illicit money laundering or its proceeds.

m. Any money counters and stamping devices used to mark identifying numbers, business numbers, accounts, or names on documents, money, or bank wrappers.

n. Accounting records including financial statements, income summaries, journals, ledgers, accounts payable, notes payable, accounts receivable, notes receivable, cash receipt journals, mortgage records, bills of sale, invoices, insurance records, expense records, receipts, and any related correspondence in electronic or paper form.

o. Records, written or electronic, reflecting any deliveries, orders, purchase invoices, or other records showing the purchase of SNAP eligible items from retailers, wholesalers, or other vendors or regarding the illegal food stamp purchasing.

p. Any USB drives, electronic documents, electronic sales transactions, or other forms of electronic media storage on which above listed records can be maintained, including but not limited to computers, PDAs, iPhones, tablets, cell phones, and thumb drives.

q. Any store security video or other recordings, including but not limited to photos of conspirators.

2. Computers or storage media used as a means to commit the violations described above.

3. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted,

21

such as logs, registry entries, configuration files, saved usernames and

passwords, documents, browsing history, user profiles, evidence of

cloud accounts or Cloud account artifacts, email, email contacts, "chat,"

instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the

COMPUTER, such as viruses, Trojan horses, and other forms of

malicious software, as well as evidence of the presence or absence of

security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence of the attachment to the COMPUTER of other storage devices

or similar containers for electronic evidence;

e. evidence of counter-forensic programs (and associated data) that are

designed to eliminate data from the COMPUTER;

f. evidence of the times the COMPUTER was used;

g. passwords, encryption keys, and other access devices that may be

necessary to access the COMPUTER;

h. documentation and manuals that may be necessary to access the

COMPUTER or to conduct a forensic examination of the COMPUTER;

i. records of or information about Internet Protocol addresses used by the

COMPUTER;

j. records of or information about the COMPUTER's Internet activity,

including firewall logs, caches, browser history and cookies,

"bookmarked" or "favorite" web pages, search terms that the user

entered into any Internet search engine, and records of user-typed web

addresses;

k. contextual information necessary to understand the evidence described

in this attachment.

4.    Any computers and peripherals or storage devices which are seized

pursuant to this warrant will be reviewed, analyzed, or imaged or copied so that, if

no contraband is found on the seized computer devices, the computer or other devices can be returned to the owner of the devices soon after imaging is completed.  Any images or copies made may be retained and analyzed consistent with the provisions of the search warrant, but no device determined to contain contraband need be returned and may be retained.  Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or solid-state drives); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.